# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF VIRGINIA
## Alexandria Division

NEYSA CALL,                                )
                                           )
              Plaintiff,        )
                                           )    Civil Action No. 1:20-cv-00260 (TSE/IDD)
      v.                           )
                                           )
SETHURAMAN PANCHANATHAN,                   )
Director, National Science Foundation,     )
                                           )
           Defendant.        )


# MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

## INTRODUCTION

Following an asthmatic reaction to a co-worker's alleged use of a fragrance spray in the National Science Foundation ("NSF") building on the afternoon of March 16, 2017, Plaintiff, Neysa Call, received the following accommodations from NSF: light-work duty, telework, relocation of her office, a parking spot, a personal printer in her office, a flexible work schedule, the opportunity for rest breaks while in the building, use of an air purifier in her office, and clearance to bring a support dog to the office.  Nevertheless, Plaintiff brings this lawsuit, alleging solely that NSF failed to accommodate her further, primarily, that it failed to "guarantee" a "workplace free of airborne irritants," and then retaliated against her once she made the request.

After months of discovery, the record contains no support for either claim.  First, in order for Plaintiff to establish even a prima facie case of failure to accommodate, she has to prove that NSF denied her request for accommodation.  To the contrary, NSF granted Plaintiff's requests over and over, and when Plaintiff made requests that were unreasonable as a matter of law, as a request for a workplace free of any possible airborne irritants unquestionably is, NSF provided reasonable alternative accommodations as the law permits.

Plaintiff's retaliation claims fare no better.  There is no evidence supporting Plaintiff's claim that her remarkably patient supervisors treated her with any retaliatory animus.  And the approximate six-month delay between the allegedly retaliatory actions Plaintiff identifies (which are not adverse in the first instance), means that these actions are far too attenuated to support the necessary causal link that Plaintiff must establish to prevail on her claims.

Plaintiff's allegations in this action are generalized, unspecified, and lack support in the extensive evidentiary record in this case.  For these reasons, the NSF Director[1] ("Defendant")

---

[1]  On June 23, 2020, Sethuraman Panchanathan was appointed the Director of NSF.  Accordingly, he is automatically substituted as the Defendant, pursuant to Federal Rule of Civil Procedure 25(d).

respectfully requests that this Court enter judgment in his favor on all of Plaintiff's claims.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

1.      In March 2017, Plaintiff was the Program Director of Communications and Analytics for the Division of Earth Sciences (or "EAR") at NSF, which was, at the time, located in a building in Arlington, Virginia.  *See* Ex. A at 19:3–14, 20:11–19.  Her first-line supervisor was Dr. Greg Anderson, who served as a Section Head in EAR.  *Id.* at 73:5–74:25.  Her second-line supervisor was Dr. Carol Frost, who was the Director of EAR.  *Id.*  Her job responsibilities included handling incoming grant proposals to NSF and communications for NSF.  *Id.* at 21:5–23:3; *see also* Ex. B.  Given her communications role, one of the essential functions of her job was speaking.  Ex. A at 101:5–10; Ex. C at 86:12–16.

2.      During the afternoon of Thursday, March 16, 2017, Plaintiff had an asthmatic reaction to a strong smell in the EAR workspace.  Ex. A at 73:7-21, 75:24-78:10.  It was later determined that a co-worker, Nadine McKenzie-Proctor, likely sprayed a fragrance from her cubicle which circulated within the EAR workspace.  *See* Ex. D at 24:1–4, 7–16.

3.      On that day, Dr. Anderson was the Acting Director of EAR.   Ex. D at 65:5–12.  Dr. Anderson learned about Ms. McKenzie-Proctor's alleged conduct in the late afternoon, and the same day, he sent out an email to EAR.  Ex. E; *see also* Ex. C at 45:11–15, 52:22–53:14; Ex. D at 23:1–13.  The email informed the division that employees should "be considerate in [their] use of perfumes, air fresheners, and other such products so [that EAR could] maintain a safe and pleasant environment for everyone." Ex. E.

4.      On Friday, March 17, 2017, while still serving as the Acting Director of EAR, Dr. Anderson sent out another email related to the prior day's events.  Ex. F.  He informed the division that he had located and set up air filters in the EAR office area to address the "strong smell" from the previous day.  *Id.*; *see also* Ex. D at 68:11–69:11.

5.      Plaintiff sought medical care for her asthmatic reaction, and stayed home from work beginning on March 17, 2017.  *See* Ex. G; Ex. H.  On March 31, 2017, Plaintiff was cleared to return to work through April 11, 2017, though she was restricted to teleworking and working half time. Ex. I.  On April 18, 2017, Plaintiff's medical clearance to telework was rescinded by her healthcare provider (Nurse Practitioner Jessica Hardy), with no back to work timetable.  Ex. J; *see also* Ex. A at 86:15–24, 87:4–7, 119:12–19.

6.      On April 26, 2017, while she remained on medical leave outside the office, Plaintiff requested an accommodation for her asthma for the first time.  Ex. K; *see also* Ex. A at 101:11–24, 102:24–103:11.  Specifically, Plaintiff requested that in the "vicinity" of her personal office, there be "no threat of airborne irritants (scents, perfumes, sprays, etc.) . . . ."  Ex. K at 5222; *see also* Ex. A at 105:10–16, 107:6–12.  Plaintiff also requested "to work in an environment that is free of toxic chemicals that may endanger her health further."  Ex. K at 5222.  Plaintiff reiterated this request while she remained on medical leave on May 22, 2017.  Ex. L; Ex. M; Ex. N.  Plaintiff never explained to NSF what irritants or chemicals are harmful to her health, or what levels of exposure she could safely tolerate.  Ex. A at 107:22–108:16, 125:23–126:11.

7.      On May 16, 2017, Plaintiff was cleared to return to work on June 21, 2017 (later changed to June 26, 2017), in a "limited capacity," despite having asthma and dysphonia.  Ex. M.

## I.      PLAINTIFF'S INTERACTIVE PROCESS WITH NSF AND HER RETURN TO WORK

8.      On May 18, 2017, Plaintiff spoke by phone with Pamela Smith, the Disability Program Manager for NSF's Office of Diversity and Inclusion.  Ex. O at 6202; Ex. P at 2345. Plaintiff explained that she had been out since the March 2017 incident on worker's compensation, and explained that she was seeking a reasonable accommodation to return to work.  *See* Ex. O at 6202.  Ms. Smith sent her an email laying out the reasonable accommodations process.  *See* Ex. P at 2345.  Among other things, the email explained that Plaintiff needed to provide medical support for

any accommodation request.  *Id.*

9.       On May 24, 2017, Ms. Smith met with Barbara Ransom, Plaintiff's union proxy, to discuss Plaintiff's accommodation request for her tentative return to work in late June 2017.  Ex. O at 6202.  They discussed moving Plaintiff's office location, providing an air purifier for Plaintiff, and temporarily removing her duties of talking, speaking, and presenting.  *Id.*

10.      On June 13, 2017, Ms. Smith met with Dr. Anderson to discuss these requests.  *Id.*; Ex. Q at 6350. Dr. Anderson agreed to look for alternative offices for Plaintiff, stated that he was open to temporarily removing Plaintiff's talking, speaking, and presenting duties, and agreed to approve up to six months of temporary medical telework for Plaintiff. *Id.*; Ex. O at 6202–03.

11.      On June 14, 2017, Dr. Anderson told Ms. Smith that two offices were available for Plaintiff's use.  Ex. O at 6202–03; Ex. Q.  On that same day, Plaintiff copied Ms. Smith on an email exchange between her and Carol Frost, the division director, regarding telework.  Ex. O at 6203.

12.      On June 15, 2017, Ms. Smith sent an email to Ms. Ransom, explaining that Plaintiff was approved for medical telework, and that Plaintiff could choose between two new offices.  Ex. O at 6203; Ex. Q.  Ms. Smith also explained that Plaintiff would need to provide medical support for her request for an air filter system.  *Id.*

13.      On June 21, 2017, Plaintiff was medically cleared to return to work on "light duty" from June 26, 2017 to July 25 2017.  Ex. R; *see also* Ex. A at 97:4–7, 118:22–25.  Plaintiff was allowed to "work up to 30 hours per week from home" until July 25, 2017, at which point she would be reevaluated.  Ex. R; *see also* Ex. C at 63:12–20.  While Plaintiff was cautioned to avoid aerosolized products, her medical clearance did not include speaking limitations.  Ex. R.  Plaintiff received similar medical clearances on July 25, 2017 and August 25, 2017.  Ex. S; Ex. T.

14.      On June 26, 2017, Plaintiff returned to work.  Ex. A at 118:22–25. She was exclusively teleworking, and working a 30-hour week.  Ex. R; Ex. C at 50:4–20, 63:12–20.

15.     That same day, Dr. Anderson explained that when she was teleworking, consistent with EAR's standard practice, she had to send weekly or daily emails to Dr. Anderson and the EAR division as to what hours she would be teleworking and how she could be reached during her telework hours.  Ex. U at 5457; *see also* Ex. A at 232:4–23, 233:23–234:5; Ex. C at 106:9–107:7.

16.     On June 29, 2017, NSF approved Plaintiff's accommodation request for a new office.  Ex. V; *see also* Ex. A at 159:21–160:10; Ex. D at 26:16–27:17; Ex. C at 42:21–45:10, 46:10–14, 47:13–48:1, 50:2–51:15, 52:9–21.  She was moved on July 3, 2017.  Ex. W; *see also* Ex. A at 159:21–160:10.  Her new office was farther away from Nadine McKenzie-Proctor.  Ex. D at 26:16–27:17; *see also* Ex. A at 159:21–160:10.

17.     On July 12, 2017, Plaintiff sent Ms. Smith an email requesting a specific parking spot in the new NSF building.  Ex. X; Ex. Y.  She also requested a printer for her office.  Ex. X.

18.     In August 2017, NSF moved to a new building in Alexandria, Virginia.  Ex. D at 7:3–9.  Plaintiff's office in the new NSF building "was selected to be distant from Nadine [McKenzie-Proctor]'s cubicle."  Ex. D at 27:22–28:7; *see also id.* at 30:8–12, 32:1–7, 33:8–15.

19.     By August 4, 2017, Plaintiff's accommodation request for a parking spot and a printer had been approved.  Ex. Z; Ex. O at 6204; Ex. Y.

20.     On September 26, 2017, Plaintiff was cleared to "work up to 40 hours per week with an option for an extendable work week."  Ex. AA.  She was medically advised that "[t]here should be limited exposure to indoor irritant[s] and allergens including deodorizers, fragrances, perfumes, etc."  *Id.*  There were no restrictions related to her voice or talking.  *See id.*  These instructions remained through at least October 26, 2017.  Ex. BB.

21.     Dr. Anderson had approved full-time medical telework for Plaintiff through October 26, 2017.  Ex. CC; Ex. DD; Ex. EE; Ex. FF; *see also* Ex. A at 130:16–132:9, 141:25–142:10; Ex. C at 50:2–52:21.  Beginning in October 2017, her telework arrangement was modified in form but not in

substance, such that two days a week she had "reasonable accommodation" telework and three days a week she had "regular" telework. Ex. GG at 2289; Ex. JJ at 2318–19, 2320–21; Ex. HH; Ex. O at 6205; *see also* Ex. II at 2261. This modified telework arrangement was effective from approximately October 26, 2017 through April 27, 2018. Ex. JJ at 2318–19. From approximately April 27, 2018 and onward, this modified telework arrangement remained in place by mutual agreement between Plaintiff and NSF. Ex. KK; Ex. O at 6206–07.

22.     Teleworking allowed Plaintiff to stay away from the NSF building and work from her home. Ex. A at 127:2–128:2, 130:16–132:9, 142:21–25. It allowed Plaintiff to avoid inhaling or breathing in any potential irritants from the NSF building. *Id.* at 130:16–132:9.

23.     In circumstances where NSF management would plan a call and Plaintiff had trouble speaking or there was a conflict with her doctor's appointment, management told her just to "listen" instead, or would "reschedule" the call for a more convenient time. *See* Ex. A at 62:9–63:18.

## II.     PLAINTIFF'S EQUAL EMPLOYMENT OPPORTUNITY COMPLAINT

28.     On May 18, 2017, Plaintiff filed an informal administrative complaint with NSF's Equal Employment Opportunity ("EEO") office. Ex. LL. She charged the following: (1) "[r]acial and disability discrimination by the National Science Foundation Human Resources investigator James Bartlett due to preferential treatment of Hostile Work Environment complaints based on race"; (2) "racial discrimination by [NSF] Human Resources Department and [EAR] Management team"; (3) "[d]iscrimination based on physical disability by the [EAR] Section Head Dr. Greg Anderson"; and (4) "[d]iscrimination and retaliation via personnel action by supervisor Greg Anderson through the annual performance review process." *Id.* at 109–12.

29.     With respect to Plaintiff's charge of disability discrimination, she alleged that Dr.

---

[2] Plaintiff has chosen only to pursue her disability-related claims here. *See* Compl. (Dkt. No. 1).

Anderson did not grant her requests of April 26 or May 22 seeking a fragrance-free workplace, and explaining that as of June 12, she had not been able to return to the office.  Ex. LL at 111.

30.    Plaintiff filed a formal administrative complaint with NSF's EEO office on September 8, 2017.   Ex. LL.  She amended her administrative complaint to include a reprisal claim on November 27, 2017.  Ex. MM.  The amendment contained no additional factual allegations beyond those from her informal complaint.  *Id.*

## III.    NSF SUPPORTED PLAINTIFF'S LEADERSHIP DEVELOPMENT PROGRAM APPLICATION

31.    On or about July 19, 2017, Plaintiff informed Dr. Anderson of her interest in applying for NSF's Leadership Development Program ("LDP").  Ex. NN.  To apply for the program, Plaintiff needed approval and support from Dr. Anderson and Dr. Frost.  *Id.*; *see also* Ex. A at 170: 5–15, 171:11–172:3.  They were "happy to support" her.  Ex. NN at 5241.  By July 31, 2017, Plaintiff had applied to the LDP with their approval.  Ex. OO; Ex. NN.

32.    On December 18, 2017, after successfully completing a three-day leadership course, Plaintiff learned that she had been accepted into the LDP.  Ex. PP.  In accepting her place in the program, Plaintiff committed to attend all of the events for the course.  *Id.*

## IV.    PLAINTIFF'S "OUTSTANDING" PERFORMANCE EVALUATION IN 2017

33.    On May 26, 2017, Dr. Anderson sent Plaintiff a performance evaluation in which he rated her overall performance as "very good."  Ex. QQ at 5380, 5384, 5391.  Plaintiff objected to the performance evaluation because Dr. Anderson had not reviewed her performance for a full evaluation period of 90 days, given that she was on medical leave.  Ex. RR.  Dr. Anderson realized Plaintiff was correct, and the performance evaluation was thus rescinded.  Ex. A at 201:16–19.

34.    Dr. Anderson sent Plaintiff a new performance evaluation of 2017 on September 27, 2017 after the 90 day supervision window had completed.  Ex. SS at 5413; Ex. TT.  He rated her performance as "outstanding."  *Id.* at 5414; *see also* Ex. A at 201:3–5.  Plaintiff signed this second

7

performance evaluation on October 9, 2017.  Ex. UU.

35.     Plaintiff was rated "outstanding" again in her 2018 performance evaluation as well. Ex. A at 201:20–22.

## V.   ADDITIONAL ACCOMMODATIONS

36.     On October 23, 2017, as she prepared to return to work full-time, Plaintiff requested additional accommodations for her disabilities.  Ex. VV at 2561.  She wanted "to see what options may be possible" in light of alleged "air quality" issues in the new NSF building.  *Id.*  She requested a "detail [to another agency], telecommuting, and extended work week."  *Id.* at 2562.

37.     On or about November 13, 2017, Plaintiff began a leadership course related to her application to the LDP.  Ex. WW.  For the purpose of attending the course, Plaintiff requested permission to bring an air purifier into the NSF building.  *Id.*  NSF approved this request.  Ex. XX.

38.     On November 15, 2017, Plaintiff emailed Dr. Anderson explaining that she intended to hold NSF business meetings on November 16 and 17 "near NSF" during her telework hours. Ex. YY at 3317.  Dr. Anderson expressed concern about Plaintiff "routinely conducting meetings on NSF business in public settings."  *Id.*  He cited NSF's telework policy, which explains that "a local coffee shop would not be considered" an "acceptable" alternate worksite to hold business meetings because "it does not meet the criteria of being free from distractions and interruptions, private, and secure."  *Id.* at 3317; *see also* Ex. ZZ at 9163; Ex. AAA at 3628, 3632.  On November 16, 2017, despite Dr. Anderson's concern, he made an exception and allowed Plaintiff to have a pre-planned meeting that day at Starbucks.  Ex. YY.

39.     On November 17, 2017, Plaintiff emailed Dr. Anderson about a detail to the United States Geological Survey ("USGS"). Ex. BBB.

40.     On November 30, 2017, NSF granted accommodations from the list Plaintiff had provided on October 23, 2017, specifically a flexible work schedule and an extended work week

when necessary.  Ex. JJ at 2322–23; Ex. O at 6205; *see also* Ex. II.  And NSF granted: (a) the option

of five days of telework per week-- two days of "reasonable accommodation" telework and three

days of "regular" telework; and (b) use of an air purifier whenever she was in the NSF office.  Ex. JJ

at 2321; *see also* Ex. A at 135:6–20; Frost Dep. Tr. at 26:16–27:17.  NSF granted these requests as

alternatives to the detail "because it would enable" Plaintiff "to continue working for NSF and

provide her with the flexibility to work on-site or from home."  Ex. JJ at 2321; *see also id.* at 2319

("The above approved accommodations have been determined to be effect[ive] and efficient in

enabling you to perform your essential duties."); Ex. A at 138:10–139:24.  Plaintiff agreed to these

alternative accommodations.  Ex. JJ at 2327; *see also* Ex. A at 146:1–10.

     41.     On December 12, 2017, Plaintiff requested that Dr. Anderson administratively

convert 120 hours of sick leave that she used between April 30, 2017 and May 20, 2017 to annual

leave.  Ex. CCC.  Though it was "highly unusual" for NSF "to make a retroactive change to leave

that far back," Dr. Anderson approved the request.  *Id.* at 2408–09.

## VI.    REQUEST FOR LEAVE IN DECEMBER 2017

     42.     On or about December 4, 2017, Plaintiff requested approximately a month's worth

of annual leave beginning the following week.  Ex. DDD *see also* Ex. A at 216:6–20.  Specifically,

Plaintiff stated that she needed a week of leave to complete her affidavit for her pending EEO

claim, and then would be on vacation through the end of the year.  *See* Ex. EEE; *see also* Ex. FFF;

Ex. C at 170:22–171:19.  On December 7, 2017, Dr. Anderson partially approved that request.  Ex.

EEE.  Dr. Anderson explained that he "[could not] support [her] request fully because of pending

work that [NSF] needed to have completed before [December 20, 2017]."  *Id.*; *see also* Ex. A at

222:22–223:3; Ex. C at 170:22–171:19.  Dr. Anderson further explained that once that work was

complete, he was "happy to support leave for the latter of the month, or . . . through . . . [January 7,

2018]."  Ex. EEE; *see also* Ex. C at 170:22–171:19.  Dr. Anderson also approved 24 hours of for

Plaintiff to work on her affidavit.  Ex. EEE; *see also* Ex. FFF.

43.     Dr. Anderson eventually extended Plaintiff's work deadline until December 22, 2017.
Ex. GGG.  He then informed Plaintiff that he was "happy to consider annual leave requests to the
extent that" her "work [was] complete by December 22, 2017."  *Id.*; *see also id.* at 3694 ("[I]f you have
other smaller leave requests between now and December 22nd that won't prevent you from
[meeting that deadline], I'll consider those requests for approval.").  After Plaintiff met the deadline,
Dr. Anderson approved, and Plaintiff took, leave through early January 2018.  Ex. A at 224:22–
225:7, 225:14–21; Ex. C at 170:22–171:19.

## VII.   ACCOMMODATIONS IN 2018–2019

44.     Plaintiff and her supervisor agreed to continue her telework arrangement even after
it expired in April 2018.  Ex. KK; Ex. O at 6206–07.

45.     On or about mid-2019, Plaintiff requested the following accommodations, which
NSF granted: (1) flexible work schedule; (2) periodic rest breaks; (3) telework; and (4) permission to
use a service dog in the NSF office.  Ex. HHH; *see also* Ex. A at 45:23–46:1, 46:8–11.  Since the
beginning of 2020, Plaintiff has been on a detail to the National Aeronautics and Space
Administration ("NASA").  Ex. A at 26:16–27:15.  She accepted the detail even though she went
into the NASA building for work, and the agency did not have a "fragrance-free" policy.  *Id.* at 32:3–
33:21, 54:7–22.

## <u>STANDARD OF REVIEW</u>

Summary judgment must be granted when "there is no genuine dispute as to any material
fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Although the
non-moving party is entitled to all reasonable, non-speculative inferences drawn in her favor, such
inferences still must be justifiable from the evidence, and she must present "significantly
probative"—not "merely colorable"—evidence in her favor.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 249, 264 (1986). A plaintiff does not defeat summary judgment with speculation, "the mere existence of *some* alleged factual dispute," or "the building of one inference upon another." *See Liberty Lobby*, 477 U.S. at 247; *Othentec Ltd. v. Phelan*, 526 F.3d 135, 140 (4th Cir. 2008).

In an employment discrimination action, "focusing on minor discrepancies that do not cast doubt on the [employer's] explanation's validity, or by raising points that are wholly irrelevant to it" is insufficient to overcome a motion for summary judgment. *Hux v. City of Newport News*, 451 F.3d 311, 315 (4th Cir. 2006). Permitting otherwise would impermissibly "substitute courts for employers as the decisionmakers of last resort in personnel matters." *Id.*; *see also DeJarnette v. Corning Inc.*, 133 F.3d 293, 298-99 (4th Cir. 1998).

## ARGUMENT

### I. DEFENDANT IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S FAILURE TO ACCOMMODATE CLAIMS AS THEY SUFFER FROM MULTIPLE INFIRMITIES.

#### A. Certain of Plaintiff's Claims Must Be Dismissed for Failure to Exhaust.

A court cannot hear any claim under the Rehabilitation Act that has not been administratively exhausted. *E.g.*, *Melendez v. Sebelius*, 611 F. App'x 762, 763 (4th Cir. 2015). Only those claims that: (1) were initially filed in an administrative complaint with an agency's EEO office; (2) were developed through a reasonable investigation of the EEO complaint by the agency, or (3) are reasonably related to the claims in the EEO complaint can be maintained in a subsequent lawsuit in federal court.[3] *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 963 (4th Cir. 1996). A claim for discrimination under the Rehabilitation Act will "typically be barred" if a plaintiff alleges "a discrete act or acts in an administrative charge" and then "subsequently alleges a broader pattern of misconduct." *Chacko v. Patuxent Inst.*, 429 F.3d 505, 509 (4th Cir. 2005) (internal citations omitted).

---

[3] The exhaustion requirements for the Rehabilitation Act are the same as those under Title VII. *See* 29 U.S.C. § 794(a); 42 U.S.C. § 12117(a).

Here, Plaintiff's EEO complaint described one discrete act that formed the basis of her failure-to-accommodate and retaliation claims under the Rehabilitation Act:  NSF's alleged failure to accommodate her request for a workplace free of unspecified airborne irritants and toxic chemicals, i.e., a "fragrance-free workplace," on April 22, 2017 and May 26, 2017.[4]  Ex. LL at 111–12.  Her federal court complaint, however, alleges failure-to-accommodate claims that are entirely different from the acts described in her EEO complaint.  Specifically, she now alleges that she was unable to telework full-time both before she made her accommodation request and after because "management assigned her to do in-person presentations and required her to attend meetings in the [NSF] building."  Compl. ¶¶ 18, 21, 22–27.  She also alleges that she was required to speak at meetings and presentations, was not allowed to hold business meetings at local coffee shops or restaurants, and was not approved for a detail to another agency where she could work in a different building.  *Id.* ¶¶ 22, 26, 27.

But Plaintiff never administratively exhausted any failure-to-accommodate claims predicated on such allegations.[5]  These claims were neither included in the EEO complaint nor developed through a reasonable investigation by NSF.  *See* Ex. III at 2080–81.  And Plaintiff's new claims (which rely on alleged conduct that post-dates her May 2017 request for a toxin-free workplace)

---

[4]  Plaintiff does not bring a claim regarding the spraying incident that occurred on March 16, 2017 itself.  Instead, her claims are targeted at NSF's alleged response to Plaintiff's injuries stemming from that day.  *See generally* Compl. (Dkt. No. 1).

[5]  Notably, Plaintiff amended her EEO complaint as late as November 27, 2017.  *See* Ex. MM. Plaintiff has only identified one meeting that she was *required* to attend at the NSF building, which took place on November 6, but chose not to include these allegations in her EEO complaint.

    In discovery, Plaintiff also raised allegations about the conditions that NSF placed on her use of a service dog in the office, mainly to accommodate another employee with a dog allergy, beginning around 2019.  *See* Ex. A at 42:12–46:1.  Plaintiff failed to raise any allegations about NSF's conditional acceptance of her request for a service dog during the EEO process, and therefore, has failed to exhaust this claim as well.

were not captured in the post-complaint investigation, which focused on events between March and May 2017. *See, e.g., Davidson v. Sarnova, Inc.*, No. 17-CV-1067-JKB, 2017 WL 3581999, at *4 (D. Md. Aug. 18, 2017) ("[C]onsidering that Plaintiff's administrative charge identified an isolated incident on a *specific date*, her post-termination allegations of *future conduct* were not likely to be 'developed by reasonable investigation of the original complaint.'" (quoting *Chacko*, 429 F.3d at 506)).

Additionally, none of the additional failure-to-accommodate claims are reasonably related to the claims in the EEO complaint. They have different factual bases than those underlying her request for a fragrance-free workplace. *Compare* Ex. LL at 111–12, Ex. III at 2080–81 *with* Compl. ¶¶ 18–27. Plaintiff, therefore, has not administratively exhausted these new failure-to-accommodate claims. *See, e.g., Chacko*, 429 F.3d at 509; *Simms v. Hagel*, No. 14-CV-433-REP, 2015 WL 5020894, at *8–9 (E.D. Va. Aug. 20, 2015) (concluding Rehabilitation Act claim directed towards denial of worker's compensation benefits was not reasonably related to administrative claim alleging denial of request for 24 hours to engage in EEO activity), *aff'd*, 641 F. App'x 268 (4th Cir. 2016). The Court should dismiss these claims.

**B.      Defendant is Entitled to Summary Judgment on Plaintiff's Failure-to-Accommodate Claims because She Cannot Establish a Prima Facie Case.**

A reasonable accommodation is one that either "enable[s] [a qualified] individual with a disability . . . to perform the essential functions of [a] position," or "enable[s] [an] employee with a disability to enjoy equal benefits and privileges of employment as are enjoyed by . . . other similarly situated employees without disabilities." *Hamel v. Bd. of Educ. of Harford Cty.*, 16-CV-2876-JKB 2018 WL 1453335, at *10 (D. Md. Mar. 23, 2018) (quotation omitted). "To establish a prima facie claim of failure to accommodate under the Rehabilitation Act, a plaintiff must demonstrate that (1) she was a qualified person with a disability; (2) the employer had notice of the disability; (3) the Plaintiff could perform the essential functions of the position with a reasonable accommodation; and (4) the

13

employer nonetheless refused to make the accommodation." *Hannah P. v. Coats*, 916 F.3d 327, 337 (4th Cir. 2019), *cert. denied sub nom. Hannah v. Maguire*, 140 S. Ct. 1294 (2020).

The plaintiff bears the "burden of identifying an accommodation that would allow a qualified individual to perform the job," as well as "the ultimate burden of persuasion with respect to demonstrating that such an accommodation is reasonable." *Lamb v. Qualex, Inc.*, 33 F. App'x 49, 59 (4th Cir. 2002).[6] The employer may then "present evidence that the plaintiff's requested accommodation imposes an undue hardship on the employer." *Id.* The employer "has the ultimate discretion to choose between effective accommodations." *Reyazuddin*, 789 at 416 (quoting *Hankins v. The Gap, Inc.*, 84 F.3d 797, 800 (6th Cir. 1996)).

1.   *Plaintiff cannot establish a prima facie case of failure to accommodate with respect to her request for a fragrance-free workplace.*

With respect to Plaintiff's central failure to accommodate claim, that NSF failed to provide her a "workplace free of excessive toxic chemicals," the record is devoid of evidence that would support three of the four prongs of a prima facie claim of failure to accommodate. For the reasons described below, Defendant is entitled to summary judgment as to this claim.

a.   To resolve whether a plaintiff is a "qualified" individual with a disability, "a court must first consider whether that person is able to perform the essential functions of the job in question." *Myers v. Hose*, 50 F.3d 278, 281 (4th Cir. 1995). Plaintiff was not "qualified" at the time she made her requests for two independent reasons.

Plaintiff claims that NSF failed to accommodate her request for a "workplace free of excessive toxic chemicals" on April 26, 2017 and May 22, 2017. Compl. ¶ 20; Ex. N; Ex. K at 5222; *see also* Ex. A at 101:11–102:11, 102:24–103-11. But it is "well-settled that an individual who has not

---

[6]   Although Plaintiff has brought claims pursuant to the Rehabilitation Act, liability under this statute is interpreted using the law applicable to the Americans with Disabilities Act. *E.g., Baird v. Rose,* 192 F.3d 462, 468 (4th Cir. 1999); *Myers v. Hose,* 50 F.3d 278, 281 (4th Cir. 1995).

been released to work by his or her doctor is not a qualified individual with a disability." *Kitchen v. Summers Continuous Care Ctr., LLC*, 552 F. Supp. 2d 589, 594 (S.D. W.Va. 2008) (collecting cases); *see also, e.g., See Lane v. Prince George's Cty. Pub. Sch.*, No. 11-CV-2088-RWT, 2013 WL 4541642, at *4 (D. Md. Aug. 26, 2013) (plaintiff not a qualified individual at the time she requested accommodation because she was not released to work by her doctor). And here, Plaintiff was undisputedly not medically cleared to return to work in any capacity in either late April 2017 or May 2017. Ex. L; Ex. M. She was only medically cleared to telework on light duty on June 26, 2017—more than a month after she made her request for the second time, and more than a month after she initiated her EEO complaint. Compl. ¶ 21; Ex. R; Ex. A at 97:4–7, 118:22–25; Ex. C at 63:12–20.[7] Absent any medical clearance to return to work (even in a teleworking capacity) at the time she made her request,[8] she could not be deemed qualified for her job.

Second, Plaintiff asserts that speaking was an essential function of her job. Ex. A at 101:5–10; *see also* Ex. C at 86:12–16. But if, as she now alleges, she was under a medical instruction to not speak after the spraying incident, she was unqualified for this additional reason. Compl. ¶ 26. Plaintiff was thus not qualified for her position when she requested a fragrance-free workplace.

    b.       Insofar as Plaintiff can demonstrate she was a qualified individual when she made her requests, she still cannot demonstrate that her request for a fragrance-free workplace was reasonable. Indeed, as a matter of law, it was not. For example, in *Buckles v. First Data Res., Inc.*, 176 F.3d 1098, 1099–1100 (8th Cir. 1999), a plaintiff was sensitive to "irritants such as hea4vy perfumes,

---

[7] By this time, as described above, *supra* p.4 ¶ 12 and p.5 ¶ 21, NSF had provided Plaintiff the alternative accommodation of medical telework.

[8] To the extent that Plaintiff argues that she was medically cleared to work only about a month after she made her request for a second time, such a temporal argument has been rejected by the Fourth Circuit. *Myers*, 50 F.3d at 283 (explaining that the element of a qualified individual does "no[t] refer[] to an individual's *future* ability to perform the essential functions of [her] position").

smoke, nail polish, glue, tar, and various adhesives." The plaintiff requested an irritant-free work

environment. *Id.* at 1101. The Eighth Circuit held that this request was unreasonable because it

would impose "an undue financial and administrative burden" as an employer "is not required . . . to

create a wholly isolated work space for an employee that is free from numerous possible irritants . . .

." *Id.* "Following *Buckles*, several courts have found that 'mandatory scent-free workplace policies

impose an undue financial and administrative burden on employers, because they are very difficult to

enforce.'" *Rotkowski v. Arkansas Rehab. Servs.*, 180 F. Supp. 3d 618, 625 (W.D. Ark. 2016) (quoting

*Heaser v. AllianceOne Receivables Mgmt., Inc.*, No. 07-CV-2924-JMR-FLN, 2009 WL 205209, *3 (D

.Minn. Jan. 27, 2009)); *Montenez–Denman v. Slater*, 208 F.3d 214, *2–*3 (6th Cir. Mar. 1, 2000)

(unpublished)); *see also McDonald v. Potter*, No. 06-CV-1, 2007 WL 2300332, at *41–45 (E.D. Tenn.

Aug. 7, 2007) (finding that request for a fragrance-free workplace or a "strictly enforced light

fragrance environment" was unreasonable); *Kaufman v. GMAC Mortg. Corp.*, No 04-CV-5671, 2006

WL 1371185, * 4 (E.D. Pa. May 17, 2006), *Hunt v. St. Peter Sch.*, 963 F. Supp. 843, (W.D. Mo.

1997))), *aff'd*, 285 F. App'x 260 (6th Cir. 2008). In addition to imposing hardship upon an employer,

a fragrance-free policy or workplace, such as the one Plaintiff requested, also "violate[s] the rights of

other employees" by "restricting their right to wear fragrances." *Heaser*, 2009 WL 205209 at *3

(citing *Wooten v. Farmland Foods*, 58 F.3d 382, 386 (8th Cir. 1995)); *see also Rotkowski*, 180 F. Supp. 3d

at 625 (same).

　　　　Courts in this circuit have reached the same conclusion. In *Feldman v. Charlotte-Mecklenburg

Bd. of Education*, No. 11-CV-34-RJC-DSC, 2012 WL 3619078 (W.D.N.C. Aug. 21, 2012), a plaintiff

suffered from "multiple chemical sensitivity," which meant that she "need[e]d to be free from paint,

toxic odoriferous cleaning products, bleach, tar, scented candles, mold in carpet or room and new

carpeting and the like . . . ." *Id.* at *1, 7 (quotation marks omitted). Plaintiff also had "adverse

reactions to deodorant, cologne, and hand lotion." *Id.* at *7. Although the plaintiff "never specified

the type of accommodation she believes would have allowed her to perform" the essential functions of her job, she seemed to "demand a complete ban on any chemicals or scented products at any school where she works." *Id.* The Court held that this was "plainly an unreasonable request." *Id.* It explained that her workplace "could never be free from any objectionable smell or any deodorant, perfume, cologne, hand lotion, or cleaning products." *Id.* (footnote omitted).

Moreover, the unreasonableness of Plaintiff's request is compounded by the fact that she has never provided a complete list of the alleged irritants or chemicals that triggered her asthma or any objective criteria by which to measure what amount of these irritants or chemicals would be permissible to Plaintiff. Rather, she has admitted that "I'm not even sure a person could make an exhaustive list . . . ." Ex. A at 37:9–38:2, 107:22–110:1, 125:4–6, 125:10–11, 125:23–126:11. And leaving NSF to guess what she considers "toxic" is unreasonable. *See Comber v. Prologue, Inc.*, No. 99-CV-2637-JFM, 2000 WL 1481300, at *7 (D. Md. Sept. 28, 2000) (finding plaintiff's request to not perform a task that "may touch off her asthma" as unreasonable because it was unknown what "particular chemicals [did] touch off her asthma even in trace amounts" and it would have forced employer "to respond, sometimes instantaneously, to the shifting triggers of [plaintiff's] asthma"); *McAlpin v. Nat'l Semiconductor Corp.*, 921 F. Supp. 1518, 1525 (N.D. Tex. 1996) (plaintiff cannot be reasonably accommodated if she cannot specifically identify "those chemicals which [plaintiff's] condition required" her to avoid). In short, the request for a fragrance-free workplace was unreasonable.

    2.    *NSF Provided Multiple Alternative Accommodations.*

Plaintiff also cannot establish a prima facie case of failure to accommodate because NSF provided her with a slew of alternative accommodations, including full-time telework as needed, a new office, a personal printer, a flexible schedule, a parking spot, work breaks in the NSF health unit, and use of an air purifier in the building. The "Rehabilitation Act does not require an employer

17

to provide the exact accommodation that an employee requests." *Hannah P.*, 916 F.3d at 338; *see also*

*Corrigan v. Perry*, 139 F.3d 888, 1998 WL 129929, at *9 (4th Cir. 1998) (table) ("[T]he

accommodation chosen by the employer need not be the 'best' accommodation possible, so long as

it is sufficient to meet the job-related needs of the individual being accommodated." (quotation

marks omitted)). "In providing [an] accommodation, the employer has the ultimate discretion to

choose between effective accommodations, and may choose the accommodation that is easier for it

to provide." *Andrews v. Virginia*, 232 F.3d 886, 2000 WL 1532333, at *1 (4th Cir. 2000) (table)

(quotation marks omitted). "The reasonableness of an accommodation is assessed objectively, and

is not viewed subjectively from the concerns of either party." *Id.*

NSF *repeatedly* accommodated Plaintiff in order to allow her to return to work on June 26,

2017.[9]  Critically, the agency allowed her to telework for all of her working hours, and repeatedly re-

entered telework agreements with Plaintiff to which she agreed.  *See* Ex. HHH; Ex. II; Ex. JJ; Ex.

CC; Ex. DD; Ex. EE; Ex. FF; Ex. KK; Ex. O at 6206–07; *see also* Ex. A at 130:16–132:9, 141:25–

142:10; Ex. C at 50:2–52:21.  Teleworking allowed Plaintiff to fulfill the essential functions of her

job while avoiding the NSF building.[10]  Ex. A at 127:2–128:2, 130:16–132:9, 142:21–25.  It allowed

---

[9]  Contrary to Plaintiff's assertion that NSF did not act in the face of the March 16, 2017 incident,
on that same day, Dr. Anderson sent an email to the entire EAR division about "be[ing] considerate
in [their] use of perfumes, air fresheners, and other such products so [that Division of EAR]
maintain[ed] a safe and pleasant environment for everyone." Ex. E; *see also* Ex. C at 45:11–15, 52:22–
53:14; Ex. D at 17:10–14, 21–22; 18:1–15, 23:1–13; 45:6–46:4; 66:22–67:7.   On the following day,
Dr. Anderson sent out another email to the entire EAR division, informing it that he had set up air
filters in the EAR office area to address the spraying incident.  Ex. F; *see also* Ex. D at 68:11–69:15.

[10]  Plaintiff contends, only in conclusory, generalized fashion, with no reference to specific dates or
contemporaneous evidence, that NSF made it impossible for her to telework by requiring "her to do
in-person presentations" and "attend meetings in the NSF building," Compl. ¶ 21.  There is no
evidence that NSF required her to be in the office, speak, or present over her objection.  Plaintiff's
unsupported, generalized allegations to this effect are insufficient to overcome summary judgment,
*see Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003), especially in the face of
Dr. Anderson's testimony that he only once asked her to come to the office, and the lack of *any*
contemporaneous evidence indicating that Plaintiff's ability to work from home was limited in any

her to avoid inhaling any potential airborne irritants or chemicals from the NSF building. *Id.* at
130:16–132:9. Unquestionably, NSF had the "ultimate discretion" to accommodate Plaintiff using
telework as opposed to the far more burdensome measure of eliminating fragrances or other
irritants from NSF's office. *Reyazuddin*, 789 F.3d at 416 (quoting *Hankins*, 84 F.3d at 800). And
where an employer provides an employee with a "reasonable alternative" accommodation, the
employer is entitled to summary judgment. *Yeung v. Loudoun Cty. Pub. Schs.*, No. 02-CV-775-CMH,
2003 WL 23314266 (E.D. Va. Jan. 17, 2003), *aff'd* 74 F. App'x 268 (4th Cir. 2003); *see also Hannah P.*,
916 F.3d at 337–38. For this reason alone, NSF is entitled to summary judgment.

But NSF did not stop at granting Plaintiff one reasonable accommodation. Rather, it
provided a slew of additional accommodations that she requested for the time she planned to spend
in the office. Plaintiff received an office further away from Ms. McKenzie-Proctor, a personal
printer, a parking space, a flexible schedule, authorization to use an air purifier, and the ability to
visit the NSF health unit for breaks. Ex. Z at 3334; Ex. W; Ex. O at 6204–05; Ex. Q; Ex. JJ; Ex. II;
Ex. D at 26:16–28:7, 30:8–12, 32:1–7, 33:8–15; Ex. A at 159:21–160:10. And when she later
requested it, Plaintiff was authorized to bring her service dog to work. Ex. HHH.

Far from failing to accommodate her, NSF granted every *reasonable* accommodation request

---

way. Ex. JJJ at 19.

At most, Plaintiff cites a November 2017 meeting where Dr. Anderson "insisted that they
meet in his office," Compl. ¶ 21; *see also* Ex JJJ at 19, but Plaintiff requested that meeting after she
had started coming into the office on occasion, *see id.* And even if meeting took place in
contravention of her reasonable accommodation agreement, a one-time violation of an
accommodation agreement does not rise to a failure to accommodate. *See Scheidler v. Indiana*, 914
F.3d 535, 542 (7th Cir. 2019); *see also Moore v. Curtis*, 68 F. App'x 561, 563 (6th Cir. 2003) (allegation
of isolated instances of failing to accommodate a disabled prisoner's condition does not state a claim
under the ADA).

Plaintiff made and then some.[11]  It is therefore entitled to summary judgment on Plaintiff's failure to accommodate claim.

### C.     Plaintiff's Unexhausted Failure-to-Accommodate Claims Fare No Better.

Even if she had exhausted her administrative remedies as to the accommodations that Plaintiff newly alleges that NSF failed to grant, her claims would still fail because the record is devoid of evidence supporting Plaintiff's claim that NSF did not accommodate her.

### 1.     *Request to Speak Less*

Plaintiff contends that NSF failed to accommodate her request to speak less when she tried working on a part-time basis around March 31, 2017[12] and after she returned to work on June 26, 2017, as the agency forced her to speak during business meetings.  Compl. ¶¶ 18, 21, 26.

Plaintiff admits that she made her first accommodation request on April 26, 2017.  Ex. K; *see also* Ex. A at 101:11–102:11, 102:24–103:11.  Even if her allegations about speaking during her return to work in early April 2017 were supported by the record, "[a]n underlying assumption of any reasonable accommodation claim is that the plaintiff-employee has requested an accommodation which the defendant-employer has denied."  *Flemmings v. Howard Univ.*, 198 F.3d 857, 861 (D.C. Cir. 1999).  Plaintiff cannot establish a claim for NSF's alleged failure to accommodate her before she even made a request.

As to Plaintiff's assertion that NSF did not accommodate her request to speak, present, and talk less on a temporary basis, NSF *granted* that request for her June 2017 return to work, and therefore Plaintiff cannot establish a prima facie claim of failure to accommodate in this regard.

---

[11]  Notably, prior to the onset of COVID-19 pandemic, Plaintiff was working in the NASA office as a detailee, and she neither requested nor needed a "fragrance-free" policy to do her job there.  Ex. A at 32:3–33:21, 54:7–22.

[12]  This aspect of the failure-to-accommodate claim readily fails to the extent that, as Plaintiff admits, speaking was an essential function of her job.  *See supra* p. 2 ¶ 1.

*Hannah P.*, 916 F.3d at 338.  The record is devoid of competent evidence indicating *when* Plaintiff

alleges she was required to speak or present beyond her abilities.

 To the extent that Plaintiff's claim that she should not have been required to speak beyond

the few weeks following her return to work, the record lacks any evidence that she made such a

request.  Moreover, plaintiff bears the burden of showing that such a request would have been

"responsive to and tailored to a specific disability."  *Coleman-Adebayo v. Leavitt*, 326 F. Supp. 2d 132,

143 (D.D.C. 2004).  Yet Plaintiff's medical clearances provided no specific limitations regarding the

frequency with which Plaintiff was allowed to speak.  Ex. R; Ex. S; Ex. T; Ex. AA; Ex. BB.

 And to the extent that Plaintiff argues that she should have been protected from speaking or

presenting in her communications role indefinitely, such a request would have been unreasonable as

that would have required NSF to eliminate an essential function of Plaintiff's job.  *E.g.*, *Lewis v.

Gibson*, 621 F. App'x 163, 164–65 (4th Cir. 2015) ("[Plaintiff's request] would necessitate changing

the essential functions of his employment.  Courts have roundly held that such requests are

unreasonable." (citing cases)); *Myers*, 50 F.3d at 282 n.2 (an employer "cannot reasonably be

expected to . . . adjust the specifications of [Plaintiff's] particular post" to provide an

accommodation).  And Plaintiff has asserted that one of the essential functions of her job was

speaking.  Ex. A at 101:5–10; Ex. C at 86:12–16.  Thus, to the extent she sought an indefinite

reprieve from all speaking, the request would have been unreasonable.  *See* Ex. A at 21:5–23:3, 88:2–

89:1 (admitting that her accommodation request was to perform only "half" of her essential

functions).

 Finally, even if the request were reasonable, there is no evidence of any example of NSF

requiring Plaintiff to speak when she was unable to do so.  *See* Ex. A at 62:9–63:18 (when Plaintiff

was asked to speak on a call and she could not, management told her to just "listen" instead, or

management would "reschedule" the call).  For these reasons, NSF is entitled to summary judgment

on this claim.

     2.    *Request to Have Off-Site Business Meetings*

Plaintiff also contends that NSF failed to accommodate her request to have off-site business meetings after she returned to work.  *See* Compl. ¶¶ 21–22.  Specifically, she appears to refer to a November 15, 2017 request to Dr. Anderson to have business meetings "near NSF," at a Starbucks coffee shop.  Ex. YY.  But NSF had a telework policy that prohibited employees from conducting business meetings at public places such as coffee shops because of security and privacy concerns.  *Id.* at 3317; *see also* Ex. Z; Ex. AAA at 3628, 3632; Ex. D at 78:20–79:14, 80:4–8.  NSF was not required to exempt her from this neutral workplace policy, particularly because Plaintiff was easily able to conduct meetings from home by phone or virtually under her telework agreement.  *EEOC v. Sara Lee Corp.*, 237 F.3d 349, 353–54 (4th Cir. 2001) ("Virtually all circuits that have considered the issue have held that the . . . reasonable accommodation standard does not require an employer to abandon a legitimate and non-discriminatory company policy." (citing cases)).  Notwithstanding the unreasonableness of Plaintiff's request, Dr. Anderson still made a one-time exception and granted it.[13]  Ex. YY at 3316.  No reasonable factfinder could conclude that NSF failed to accommodate her request to have off-site meetings.

     3.    *Detail*

Plaintiff raised the prospect of a detail in the context of negotiations regarding her accommodation.  Ex. JJ at 2321, 2327.  But NSF proposed, and she agreed to an alternative accommodation on November 30, 2017.  *Id.*; *see also* Ex. A at 136:24–137:5, 146:1–10.  Setting aside

---

[13]  And just because Dr. Anderson made an exception once, that does not mean he was obligated to do so again.  *Cf. Myers*, 50 F.3d at 284 ("A particular accommodation is not necessarily reasonable, and thus federally mandated, simply because the [employer] elects to establish it as a matter of policy.  While the [employer] is free to exceed the requirements of the [disability statutes] . . . such policies are not the definitive source of the standard by which reasonable accommodation is measured under federal law.").

the question of whether a detail to another agency (which would require other NSF personnel to cover Plaintiff's duties while she worked for a different agency) is a reasonable accommodation request as a matter of law, Plaintiff received flexible telework and use of an air purifier whenever she was in the NSF building as an alternative accommodation, and one which allowed to continue her work for NSF. *Id.*; *see also* Ex. A at 135:6–20; Ex. D at 26:16–27:17.

## II.   PLAINTIFF HAS FAILED TO ESTABLISH A PRIMA FACIE CASE AS TO HER RETALIATION CLAIMS.

Absent any direct evidence of retaliatory animus—as is the case here—a retaliation claim is subject to the familiar *McDonnell Douglas* burden-shifting framework, which first requires a Plaintiff to establish a *prima facie* case of retaliation: (1) engagement in protected activity, (2) an adverse action, and (3) a causal connection (or causal chain) between the protected activity and the employment action. *Hooven-Lewis,* 249 F.3d at 272. An adverse action effects an injury or harm that is significant and not trivial. *Laird v. Fairfax Cty.,* __ F.3d__, __, 2020 WL 6228005, at *4 (4th Cir. 2020).[14]

As to causation, there must ordinarily be "some degree of temporal proximity to suggest a causal connection." *Constantine v. Rectors & Visitors of George Mason Univ.,* 411 F.3d 474, 501 (4th Cir. 2005). "A lengthy time lapse between the [defendant's] becoming aware of the protected activity and the alleged adverse action" often "negates any inference that a causal connection exists between the two." *Id.* (alterations omitted) (quoting *Dowe v. Total Action Against Poverty in Roanoke Valley,* 145

---

[14] The Supreme Court's recent decision in *Babb v. Wilkie* suggests that the adversity and causation standards for employees bringing retaliation claims under Title VII and the Age Discrimination in Employment Act against the federal government may be altered slightly. 140 S. Ct. 1168 (2020). Although applying those standards would make no difference in this case, *Babb* does not apply here because the Rehabilitation Act expressly borrows its liability standards from the ADA. *See* 29 U.S.C. § 794(d); *Myers,* 50 F.3d at 281. The ADA's anti-retaliation provision, 42 U.S.C. § 12203(a), is similar to the Title VII anti-retaliation provision for private sector employees, *see* 42 U.S.C. § 2000e-3(a), the interpretation of which was not altered by *Babb.* Indeed, in *Babb,* the Supreme Court observed that its prior interpretation of Section 2000e-3(a) "has no application in the present case." 140 S. Ct. at 1176.

F.3d 653, 657 (4th Cir. 1998)).  Gaps of even just two to five months are insufficient to reasonably

infer causation.  *See Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273–74 (2001) (collecting cases

holding a three-to-four-month period to be insufficient to show retaliation); *Pascual v. Lowe's Home

Centers, Inc.*, 193 F. App'x 229 (4th Cir. 2006) (per curiam) (similar);*Adkins v. Fairfax Cty. Sch. Bd.*, No.

08-CV-91, 2008 WL 2076654, at *6 (E.D. Va. May 15, 2008), *aff'd* 297 F. App'x 202 (4th Cir. 2008)

(collecting cases and granting motion to dismiss the Plaintiff's retaliation claim, where adverse

actions occurred two months and five months after protected activity).

The framework then permits a defendant to articulate a legitimate, non-retaliatory reason for

the employment action, and, finally, requires the plaintiff to prove that the justification is pretextual.

*See Netter v. Barnes*, 908 F.3d 932, 938 (4th Cir. 2018).  The plaintiff must show that her protected

activity was the "but for" cause for any adverse action.  *See Palmquist v. Shinseki*, 689 F.3d 66, 76–77

(1st Cir. 2012) (applying ADA's "but for" causation standard for retaliation claim under

Rehabilitation Act because the Rehabilitation Act adopts the ADA's standards for liability); *Gentry v.

E.W. Partners Club Mgmt. Co.*, 816 F.3d 228, 235–36 (4th Cir. 2016) (adopting "but for" causation for

ADA claim).  The burden of proving retaliation rests at all times with the plaintiff.  *Staley v.

Gruenberg*, 575 F. App'x 153, 155 (4th Cir. 2014).

Here, Plaintiff specifically relies on two protected activities for her retaliation claims: (1) her

complaint of disability discrimination on May 18, 2017; and (2) her request for a workplace free

from toxic chemicals, which was last made on May 22, 2017.  Compl. ¶¶ 20, 31; Ex. N; Ex. LL; Ex.

A at 66:21-67:7.  But the remaining elements of a prima facie case are lacking for all of the retaliation

claims.  Even if they were not, NSF nevertheless had a legitimate, non-retaliatory reason for its

actions.

### A. Plaintiff Cannot Establish a Prima Facie Case of Retaliation With Respect to NSF's Alleged Failure to Accommodate Her and the Partial Denial of Her Leave Request.

#### 1. *Alleged failure to provide fragrance-free workplace*

Plaintiff claims that NSF retaliated against her for making a "request for a toxic-free workplace" in May 2017 by "denying [her] the right to work in a healthy environment." Compl. ¶ 31. To be sure, the alleged retaliatory conduct does not constitute an adverse action, and even if it did, the record is completely devoid of evidence supporting a causal connection to her request.

More importantly, however, "courts do not recognize retaliation claims that are simply repackaged failure to accommodate claims." *Brittan-Powell v. Coppin State Univ.*, No. 19-CV-2902-ADC, 2020 WL 1809192, at *4 (D. Md. Apr. 9, 2020) (alteration, citation, and quotation marks omitted). In other words, a retaliation claim cannot rely on an action that "stem[s] directly from the employer rejecting requested accommodations." *Id.* (citation omitted); *see also Rodrigo v. Carle Found. Hosp.*, 879 F.3d 236, 243 (7th Cir. 2018) ("[Plaintiff] may not make an end-run around the 'qualified individual' requirement by simply reframing a[n] . . . accommodation claim as one for retaliation."). Here, there is no difference between Plaintiff's claim that NSF failed to provide her with a healthy work environment and her claim that NSF denied Plaintiff's accommodation request for a workplace free of toxic chemicals. This claim is thus no more than a "repackaged failure to accommodate claim." *Brittan-Powell*, 2020 WL 1809192, at *4. It must fail.

Nevertheless, this claim must fail for yet another reason. The record is devoid of any evidence of causation. Indeed, as discussed above, NSF freely allowed Plaintiff to telework as an alternative accommodation, along with a long list of additional accommodations, and Plaintiff agreed to them. *See supra* pp. 17–19. And the record further lacks *any* evidence of retaliatory animus on the part of Plaintiff's supervisors.

Rather, NSF provided Plaintiff with multiple alternative accommodations that were easier to

implement and allowed her to fulfill the essential functions of her position, including the opportunity to work from home, where she could control her working environment, and thus, there is no action on which Plaintiff can base her claim. Ex. JJ at 2319 ("The above approved accommodations have been determined to be effect[ive] and efficient in enabling you to perform your essential duties."), 2321. Further, rather than display *any* retaliatory animus against Plaintiff, her supervisors continued to support her career progression. Dr. Anderson and Dr. Frost gave her an outstanding performance evaluation in September 2017. Ex. SS; Ex. A at 201:3–5, 16–19. They supported her application for the competitive Leadership Development Program, which allowed Plaintiff to apply. Ex. NN. Dr. Anderson also retroactively converted sick leave (that she had taken in early 2017) to annual leave even though it was a "highly unusual" administrative request, so that she could carry over additional sick leave to 2018 and not lose any annual leave in 2017. Ex. CCC at 2408–09. Defendant is entitled to summary judgment on this claim.

2.    *Alleged Denial of Plaintiff's Annual Leave Request in December 2017*

Plaintiff claims that Dr. Anderson retaliated against her for protected activities in May 2017 by "not allowing her to take leave for her wedding" in December 2017. Compl. ¶ 27; Ex. EEE. But Plaintiff cannot establish a causal link between her protected activities and the alleged adverse action. *See Constantine*, 411 F.3d at 501. The approximate six-to-seven month gap between the protected activities to which she points and Dr. Anderson's partial denial of Plaintiff's leave request is too remote to establish any causal connection between these events. *See Clark Cty.*, 532 U.S. at 273–74; *Pascual*, 193 F. App'x at 229; *Adkins*, 2008 WL 2076654, at *6.[15]

Further, Dr. Anderson had a legitimate, non-retaliatory reason for denying Plaintiff's leave request in December 2017. He explained to Plaintiff that he was denying the full extent of her leave

---

[15] Notably, Plaintiff testified that she did not tell Dr. Anderson that she was getting married until after he pushed back against her month-long leave request. Ex. A at 224:22–225:7, 227:4–11.

request because he was concerned that taking approximately one month of leave would have resulted in her missing a work deadline in mid-to-late December.  Ex. EEE; Ex. GGG; *see also* Ex. A at 222:22–223:3; Ex. C at 170:22–171:19.  He offered to approve 24 hours of leave for Plaintiff to complete her affidavit for the EEO process in early December, as well as any leave request after she met her deadline.  Ex. EEE; *see also* Ex. FFF; Ex. C at 170:22–171:19.  He ultimately approved all of the leave Plaintiff requested after she completed her work.  Ex. A at 224:22–225:7, 225:14–22; Ex. C at 170:22–171:19.  And there is no evidence of retaliatory animus as he was contemporaneously ensuring that any annual leave that Plaintiff could not use was not lost for the calendar year.  Ex. CCC at 2408–09.  For these reasons, NSF is entitled to summary judgment on this claim.

### B.  Plaintiff's Remaining, Unexhausted Retaliation Claims Must Fail as Well.

1.   *Plaintiff failed to exhaust her remaining retaliation claims.*

Plaintiff, who was represented by counsel through the EEO process, had the opportunity to exhaust her remaining retaliation claims, but failed to do so.  For this reason alone, NSF is entitled to summary judgment as to these claims.  As explained above, a plaintiff must exhaust administrative remedies before asserting claims under the Rehabilitation Act in federal court.  *See supra* Part I.A.  A plaintiff may raise a retaliation claim for the first time in federal court, so long as it is related to the retaliatory conduct in the EEO complaint.  *See Nealon v. Stone*, 958 F.2d 584, 590 (4th Cir. 1992).  If, however, the plaintiff could have raised a retaliation claim in the initial EEO complaint and failed to do so, this exception to the exhaustion requirement does not apply.  *See Ackerson v. Rector & Visitors of the Univ. of Va.*, No. 17-CV-11, 2017 WL 5161993, at *2 (W.D. Va. Nov. 7, 2017); *Cumberlander v. KCL Site Servs., LLC*, No. 08-CV-994-CMH, 2009 WL 4927144, at *3 (E.D. Va. Dec. 17, 2009).

Here, Plaintiff amended her EEO complaint to include retaliation claims on November 27, 2017.  Ex. MM.  However, Plaintiff now raises claims regarding events that pre-date November 27, 2017, but which she did not include in her EEO complaint or amendment.  *See* Compl. ¶ 27.

27

Because Plaintiff had the opportunity to include the below claims in her November 27, 2017 amendment to her EEO complaint but failed to do so, the claims discussed in Part II.B.2, *infra*, should be dismissed for failure to exhaust.  *See, e.g., Cumberlander*, 2009 WL 4927144, at *3.

2.      *Plaintiff's unexhausted retaliation claims fail on their merits.*

While Plaintiff's unexhausted claims are discussed individually below, the record fails to support a prima facie case of retaliation for any of them.  With respect to all of these claims, there is no evidence of a causal connection between any of the alleged events on which Plaintiff bases her retaliation claims and her May 2017 protected activity.  Indeed, as discussed above, during the time between May 2017 and the end of that year, the record demonstrates that Plaintiff's supervisors continually supported her requests for accommodations, fostered her professional development, sponsored her for the Leadership Development Program, and helped her to avoid losing any annual leave—actions which go directly against Plaintiff's claim that her supervisors acted with retaliatory animus.  *See supra* pp. 25–26.

Further, with respect to all of the alleged retaliatory acts described below, Plaintiff cannot establish a temporal link between the action and her protected activity.  As to the alleged criticism of her work and the instances in which she was required to speak, *see* Compl. ¶ 27, Plaintiff's failure to provide any concrete examples makes it impossible to establish a temporal link between these generalized allegations and her protected activity.  And with respect to the decision that Plaintiff would not go on detail to USGS and her onsite meeting with Dr. Anderson, these events took place in November 2017, *see id.*, six months after Plaintiff's protected activities and far too attenuated to support her claims of retaliation, *see Clark Cty.*, 532 U.S. at 273–74; *Pascual*, 193 F. App'x at 229; *Adkins*, 2008 WL 2076654, at *6.  These claims fail for the following additional reasons.[16]

---

[16]  To the extent that Plaintiff argues the denial of her request for a detail to USGS was retaliatory, such a claim amounts to no more than a repackaging of her failure to accommodate claim, and it

*Criticism.*  Plaintiff vaguely claims that Dr. Anderson retaliated against her for the protected activities in May 2017 by "unfairly scrutinizing and criticizing her work" during some unknown date or period of time.  Compl. ¶ 27.  Even if the record supported this allegation, which it does not, criticism of work product is not an adverse action.  *See Sabir v. Thompson*, 87 F. App'x 833, 834 (4th Cir. 2002) (holding that criticism of work "did not amount to redressable adverse employment actions" (citations omitted)); *Harris v. Esper*, No. 18-CV-901-LO, 2019 WL 8888214, at *2 (E.D. Va. Aug. 15, 2019) (dismissing retaliation claim based on allegation that Plaintiff was "hyper-scrutinized" by employer); *Noland v. Henderson*, No. 99-CV-1027-AVB, 2000 WL 33158294, at *5 (E.D. Va. Jan. 28, 2000) ("[[T]he type of actions alleged, e.g., criticizing Plaintiffs' work . . . do not amount to retaliation . . . ."), *aff'd*, 238 F.3d 413 (4th Cir. 2000).

*Onsite meeting.*  Plaintiff claims that Dr. Anderson retaliated against her for her protected activities by refusing to conduct a meeting that *Plaintiff requested* on or about the week of November 6, 2017 "outside the office . . . ."  Compl. ¶ 27; Ex. JJJ at 19.  However, Dr. Anderson's preference to have a meeting in his office is not an adverse action.  There is no evidence that this one-off meeting at the NSF office caused Plaintiff any significant harm or injury.  *See* US 2390 (no mention of any medical issues arising from meeting with Dr. Anderson).  Indeed, Plaintiff could have "limited exposure" to indoor irritants.  *See* Ex. BB.[17]

Dr. Anderson also had a legitimate, non-retaliatory reason to meet with Plaintiff in his office. The meeting concerned Plaintiff's performance and Dr. Anderson tended to do those meetings in person.  Ex. JJJ at 19.  He was concerned about meeting Plaintiff in public in case they were overheard on this sensitive topic.  Ex. LLL; *see also* Ex. YY at 3316–17 (Dr. Anderson allowing

---

must fail. *See supra* p. 25.

[17]  Indeed, this claim is also simply another repackaged version of Plaintiff's failure to accommodate claim, and therefore, it should be denied.  *See supra* p. 25.

exception for a meeting at Starbucks, despite privacy concerns).

*Speaking Restrictions.* Plaintiff generally claims that Dr. Anderson and Dr. Frost retaliated against her for her May 2017 protected activities by "violat[ing] [her] medical restriction on speaking for long periods of time" after she tried to work part-time on March 31, 2017 and after she returned to light-duty work on June 26, 2017.  Compl. ¶¶ 18, 21, 26.  As already explained, however, a retaliation claim cannot merely be a repackaged failure to accommodate claim.  *See supra* p. 25.  But that is what Plaintiff has done here.  A violation of her alleged medical restriction against speaking for extended periods of time is no more than the consequence of the alleged rejection of her accommodation request to not speak much while working, and thus cannot be the basis of a retaliation claim.[18]  *See Walker v. Wilkie*, No. 19-CV-249-FDW-DCK, 2020 WL 497136, at *7 (W.D.N.C. Jan. 30, 2020) ("[The] adverse action in the retaliation claim cannot be the same adverse action which prompted the protected activity." (internal citation omitted)).

To the extent Plaintiff can make a prima facie case of retaliation, NSF had a legitimate, non-retaliatory reason to ask her to speak.  As Plaintiff admits, speaking was an essential function of her job.  Ex. A at 101:5–10; Ex. C at 86:12–16.

## CONCLUSION

For the foregoing reasons, Defendant Panchanathan respectfully requests that this Court grant his motion for summary judgment.

<u>Date</u>: November 13, 2020                                    Respectfully submitted,

                                                                                  G. ZACHARY TERWILLIGER
                                                                                  UNITED STATES ATTORNEY

                                                        By:         /s/         .
                                                                                  HUGHAM CHAN
                                                                                  REBECCA S. LEVENSON
                                                                                  Assistant United States Attorneys
                                                                                  2100 Jamieson Avenue

---

[18]  Plaintiff's failure to accommodate claim in this regard also must fail.  *See supra* Part I.C.1.

Alexandria, VA 22314
Telephone: (703) 299-3760
Fax: (703) 299-3983
Email:  Hugham.chan@usdoj.gov
Rebecca.s.levenson@usdoj.gov

*Counsel for Defendant*